NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0277n.06
Filed: April 13, 2007

No. 05-4490

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| THEODHOR THANASI, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON PETITION FOR REVIEW OF |
| | ) | |
| V. | ) | AN ORDER OF THE |
| | ) | |
| ALBERTO GONZALES, | ) | BOARD OF IMMIGRATION APPEALS |
| | ) | |
| Respondent-Appellee. | ) | |

Before: BOGGS, Chief Circuit Judge, DAUGHTREY and GIBBONS, Circuit Judges.

**PER CURIAM.** The petitioner, Theodhor Thanasi, seeks review of the administrative denial of his requests for asylum, withholding of removal, and relief pursuant to the United Nations Convention Against Torture on his own behalf and that of his wife, Fato, and his son, Orsin. Before this court, he asserts that the immigration judge erred in refusing to admit certain evidence and testimony at the hearing held in this matter, in finding his testimony not credible, and in refusing to presume that the petitioner had a well-founded fear of future persecution in his native Albania due to the past persecution that he allegedly suffered as a dissident journalist. Because we conclude that the petitioner failed to establish past persecution sufficient to support relief, that the immigration judge's evidentiary rulings were justified, and that no evidence compels a conclusion that country conditions in Albania are such that Thanasi could establish a well-founded fear of future

persecution, we find no basis on which to overturn the decision of the Board of Immigration Appeals (BIA), and we therefore deny the petition for review in this matter.

**FACTUAL AND PROCEDURAL BACKGROUND**

Thanasi is an Albanian national who entered this country on a visitor's visa in 2001 and overstayed the period authorized by the visa. In his asylum application and at evidentiary hearings conducted before an immigration judge, he explained that he had worked as a journalist in Albania. For three years, from 1997 to 2000, Thanasi wrote political articles for the Albanian Telegraph Agency, an organization controlled by the Albanian government. Due to his alleged criticism of government officials, however, Thanasi was removed from the prestigious Parliament "beat" and, eventually, was terminated altogether from his employment with the agency. Nevertheless, the petitioner said, he obtained other journalist jobs with independent papers within Albania and continued to write articles critical of the government under such pseudonyms as "Dhori," "Dashnor," "Dashnor Kapi," "Phalis Elna," "Elsa Fotion," and "Orisini." Because of various threats of retribution, however, the petitioner "fortified" his family's apartment by installing a "lead proof door" and protective metal bars.

Thanasi also testified to four alleged incidents of violence against him that, he claimed, led him to devise a plan to have his family leave Albania for the relative safety of the United States. First, he related that, while standing "outside of the building of the Department of Justice of the Court" in November 1998, he was punched in the ribs by a

police officer who told the petitioner to be careful about what he was doing. Next, Thanasi testified that in August 2000, he was driving home to Tirana from Vlora when he was stopped at a checkpoint and was ordered to show certain documents to the police. After examining the documents, one officer pulled the petitioner from the car, slapped him "very hard" in the face, and told him to be careful about his activities. The third incident related by the petitioner allegedly occurred in December 2000, when three police officers came to Thanasi's apartment, ordered him at gunpoint to accompany them to the police station, rushed him down the stairs to a waiting van occupied by masked men, drove him to the police station, and locked him in a cell for approximately three hours until he was released and told that his arrest was a misunderstanding. Finally, Thanasi testified that on February 7, 2001, only two days after a particular article of his appeared in a local newspaper, he was accosted by three men as he left his office late at night. The men held the petitioner's arms behind his back, jostled him, spoke rudely toward him, and threatened "problems" should he continue his critical reporting.

Additional oral testimony was offered at the hearing by Thanasi's wife and two sons. Fato Thanasi confirmed that her husband suffered problems as a journalist because of the political nature of his writings, testifying, for example, that she had received threatening telephone calls at home warning that if the petitioner did not cease his political reporting, he would be burned alive and the couple's children "would not come home some day." The petitioner's two sons testified that their father accompanied them on their daily walks to school for fear that his enemies would exact retribution on the boys. Finally, Fotjon

Thanasi, the petitioner's elder son, who was already in the United States on a student visa, recounted an incident that his mother related to him after her arrival in the United States. Specifically, he testified that, while she was still living in Albania, Fato Thanasi had been forced into an unknown vehicle and told by her assailants that they knew where Fotjon was and that "the best thing for her and her family [was] to join [him] in America."

At the evidentiary hearing, however, the immigration judge refused to admit other testimony and documentary evidence offered by Thanasi. For instance, when the petitioner proffered a translated article from a March 11, 2004, edition of the newspaper "Albania" in an effort to bolster his claim that his journalistic endeavors made him a marked man in his homeland, the immigration judge ruled that the article "could have been produced [earlier than three days before the hearing continued] and it's not properly translated in any event." The immigration judge also disallowed the oral testimony of one of the petitioner's journalist colleagues, Zef Pergega, because:

> [Thanasi] knew over 6 months ago [–] that probably would have been shortly after the last hearing. He should have presented his name earlier and in any event, it sounds like we would have to undergo a lengthy trial about his complaints and his history and I'm not going to get in the middle of that. So, basically it's too late.

Considering only the testimony and documentary evidence found admissible at the hearing, the immigration judge concluded that Thanasi's claims for relief should be denied. In doing so, he found that the petitioner was not credible and that at least three of the incidents of alleged persecution highlighted by Thanasi probably did not happen as the

petitioner testified. The immigration judge further concluded, however, that "even if one were to assume that the incidents happened . . ., none of them, either singly or in combination of any of the other, rise to [the] level of past persecution." The immigration judge also determined that Thanasi had not established that any group to which he belonged is today subjected, either singly or collectively, "to a pattern or practice of persecution." The immigration judge thus denied Thanasi's requests for asylum, for withholding of removal, and for relief under the Convention Against Torture.

The BIA adopted and affirmed that initial decision "except insofar as the Immigration Judge found inconsistencies regarding when [Thanasi] was fired" from his job with the Albanian Telegraph Agency. The Board further found no abuse of discretion in the immigration judge's decision not to admit into evidence a newspaper article that was not offered until after the time limit set for the filing of applications and related documents. The BIA also ratified the immigration judge's decision not to allow oral testimony from an individual with whom Thanasi became reacquainted six months prior to the date on which he sought to offer the testimony, but whose name was not placed on a witness list until immediately prior to the continued hearing. From these evidentiary and substantive rulings, Thanasi now petitions for review.

## DISCUSSION

When, as in this case, the BIA summarily affirms a portion of the decision of an immigration judge without discussing the relevant issues in depth, "we review the

[immigration judge's] decision as the final agency decision." *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003). That administrative ruling must be sustained if the determination is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). "Under this deferential standard, we may not reverse the Board's or the immigration judge's determination simply because we would have decided the matter differently." *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (citing *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998)). Rather, to overturn such a factual determination, "we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Elias-Zacarias*, 502 U.S. at 481 n.1 (emphasis in original).

## A. Request for Asylum

Before the immigration judge and the BIA, Thanasi pursued numerous avenues of relief, including a request for political asylum. As we have explained, "resolution of any request for asylum involves 'a two-step inquiry: first, whether the petitioner is a "refugee" within the meaning of the [Immigration and Nationality Act], and second, whether the petitioner merits a favorable exercise of discretion by the Attorney General.'" *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (quoting *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994)). *See also INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987); 8 U.S.C. § 1158(b)(1).

Section 1101(a)(42)(A) of title 8 of the United States Code defines the term

"refugee" to mean:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

"An applicant who has been found to have established . . . past persecution shall also be

presumed to have a well-founded fear of persecution on the basis of the original claim," 8

C.F.R. § 208.13(b)(1), unless the immigration judge finds, by a preponderance of the

evidence, either that:

> (A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . . on account of . . . membership in a particular social group, or political opinion; or
>
> (B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so.

8 C.F.R. § 208.13(b)(1)(i).

Consequently, even if we were to conclude that the immigration judge erred both

in his credibility finding and in his conclusion that the incidents of harassment alleged by

Thanasi did not amount to "persecution," the petitioner still could not prevail on his asylum

claim unless we also determined that the evidence before the immigration judge *compelled* a finding that country conditions have not improved in Albania in the years since the petitioner's flight from that nation. Unfortunately for Thanasi, the evidence in the record does not compel either a conclusion that the treatment to which the petitioner was subjected constitutes past "persecution" or a conclusion that country conditions have not changed significantly since Thanasi left his homeland.

Although the Immigration and Nationality Act contains no definition of the term "persecution," *see Mikhailevitch*, 146 F.3d at 389, we have concluded, as have many of our sister circuits, that the "persecution" envisioned by the Act "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by physical punishment, infliction of harm, or significant deprivation of liberty." *Id*. at 390. Measured by this standard, the four instances of alleged persecution identified by Thanasi – a single punch to the ribs, a slap to the face, an admittedly mistaken arrest, and momentary jostling and verbal harassment – simply do not qualify as statutory persecution. Although certainly intended as harassment, the physical contacts described by the petitioner cannot honestly be termed "punishment" or "harm," and the deprivation of liberty cannot be considered so significant as to rise to the level of persecution. This record clearly does not compel the conclusion that the immigration judge erred in finding that Thanasi had not been persecuted in Albania.

Moreover, country reports prepared by the United States Department of State for 2003 and 2004 paint a picture of a free, if somewhat corrupt, Albanian press. For example, the 2003 Country Report on Human Rights Practices, released on February 25, 2004, states that "[o]ccasionally physical violence was used against journalists," but the same report recognizes that Albania's "Law on Fundamental Human Rights and Freedoms provides for freedom of speech and of the press, and the media was active and largely unrestrained." Furthermore, the State Department's March 2004 profile of Albania states:

> [T]here have been no major outbreaks of political violence since 1998, and the available evidence suggests that neither the Government nor the major political parties engage in policies of abuse or coercion against their political opponents. Though serious political repression existed in the past, there are no indications of systemic political persecution in Albania at the present time.

After reviewing the testimony and documents admitted into evidence in this matter, the immigration judge found that Thanasi "has not demonstrated that today in Albania either [human rights activists or journalists writing about political matters], singly or collectively[,] are subject to a pattern or practice of persecution." Because our review of that evidence does not compel a contrary conclusion, we must defer to the immigration judge's factual determinations. The petitioner has, therefore, failed to meet his burden of establishing eligibility for a grant of asylum.

**B. Request for Withholding of Removal**

Thanasi also seeks review of the administrative denial of his request for withholding of removal. Pursuant to the provisions of 8 U.S.C. § 1231(b)(3)(A), "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." Thus, in order to qualify for withholding of removal, the petitioner "must establish that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004). To make such a showing, a petitioner "must demonstrate that 'it is more likely than not' that he or she will be persecuted upon return." *Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005) (quoting 8 C.F.R. § 1208.16(b)(2)). Because this burden is "a more stringent burden than what is required on a claim for asylum," *id.* at 640 (quoting *Pilica*, 388 F.3d at 951), it follows from Thanasi's failure to establish eligibility for asylum that he also cannot satisfy the more onerous burden for withholding of removal. *See, e.g.*, *Koliada*, 259 F.3d at 489.

## C.  Request for Relief Under the United Nations Convention Against Torture

The petitioner additionally requested relief under the provisions of the United Nations Convention Against Torture. To obtain withholding of removal under that convention, "[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). This burden is also significantly greater than the burden required

to demonstrate eligibility for asylum. Whereas asylum may be granted by the attorney general upon a showing of a "well-founded fear of persecution," withholding of removal under the Convention Against Torture requires a showing that it is more likely than not that Thanasi would not only be persecuted upon his return to Albania, but that he would be *tortured*. Because the petitioner cannot demonstrate entitlement to a grant of asylum in this case due to changed conditions, he also cannot meet the more stringent requirements of the Convention Against Torture. *See, e.g.*, *Liti*, 411 F.3d at 641. Substantial evidence thus supports the immigration judge's denial of this extraordinary relief.

## D. Evidentiary Rulings

Thanasi challenges the immigration judge's decision not to admit into evidence a copy of an article from an Albanian newspaper that accuses the petitioner of causing much of the strife that plagued Albania during the late 1990's and early 2000's. Thanasi sought introduction of that unflattering journalistic exposition to establish that certain Albanians might seek to do him harm if forced to return to his homeland.

In denying the request to admit the article, however, the immigration judge relied upon several valid considerations. First, as noted by the BIA, 8 C.F.R. § 1003.31(c) provides:

> The Immigration Judge may set and extend time limits for the filing of applications and related documents and responses thereto, if any. *If an application or document is not filed within the time set by the Immigration*

> *Judge, the opportunity to file that application or document shall be deemed waived.*

(Emphasis added.) Thanasi does not dispute that his request for admission of the newspaper article came well after the filing deadline set by the immigration judge. Nevertheless, he asserts that he should not have been held to that deadline because the article was not published until March 11, 2004, four months after the initial phase of the hearing and less than two months prior to the continuation of the hearing.

Even if we were to hold that the strict deadlines established for the filing of documents in support of an asylum application should be waived in this instance, other potential defects in the proposed evidence justify the immigration judge's discretionary determination. First, the translated article does not contain an original signature of a translator. Instead, the translated article is followed simply by a pre-printed signature certifying the accuracy of the translation, dated ten months prior to the release date of the newspaper edition. Furthermore, the article does not refer to Theodhor Thanasi, but rather to an individual named Xhelil Thanasi. Although the petitioner testified on the first day of the evidentiary hearing that he used many nicknames or aliases in writing his political articles, he never mentioned using the name Xhelil in such a context. He did later claim before the immigration judge, however, that his mother and siblings sometimes called him by the name Xhelil, but he failed to explain adequately how another journalist would have stumbled across that childhood name.

In any event, it is clear to us that the admission of the disputed article would not have affected the immigration judge's ultimate decision in this matter. The mere fact that unflattering articles are still written in Albania about the petitioner does not equate with a showing that the petitioner has a well-founded fear of persecution because of his journalism should he return to his homeland. This challenge is thus without merit.

Thanasi also contends that the immigration judge erred in denying his former compatriot, Zef Pergega, the opportunity to testify on Thanasi's behalf. In refusing to allow Pergega to testify, the immigration judge noted that the petitioner became aware of Pergega's presence in the Detroit area six months prior to listing his name on a witness list just days before the asylum hearing resumed; thus, the notice to the government of the admittedly "fairly involved testimony" came "too late." Even if Pergega had testified, we do not believe that the ruling of the immigration judge would have been affected. According to the offer of proof made by the petitioner's attorney at the hearing, Pergega would have testified to Thanasi's journalist status, a previously disputed issue that was later resolved in favor of the petitioner, and to the fact that Thanasi was fired from the Albanian Telegraphic Agency because of political differences with his boss, Frrok Cupi. However, none of that testimony bore any relevance to whether Thanasi suffered past persecution or whether changed country conditions in Albania would permit the petitioner to return to his homeland without a well-founded fear of future persecution. This allegation of error is thus also without merit.

**CONCLUSION**

For the reasons set out above, we sustain the immigration judge's determination that the petitioner failed to establish that the harassment he suffered in Albania rose to the level of persecution necessary to support a grant of asylum and that he failed to establish a basis for a well-founded fear of future persecution if he returns there. We also sustain the BIA's determination that the immigration judge did not commit an abuse of discretion in refusing to accept evidence that was not authenticated, not produced in a timely manner, or not of such a nature that it would have altered the immigration judge's ultimate conclusions. We therefore DENY the petition for review.